Mr. Patterson, good morning. Good morning, your honors. I'd like to reserve three minutes for rebuttal if that's okay. You may. Thank you, Judge. May it please the court, Kay's Merchandise Company sold general merchandise, furniture, diamond jewelry in midwestern small market cities such as Decatur, Peoria, Paducah, Kentucky. It was going along fine when suddenly in February of 2006 it was told by a former Gordon Brothers employee, Robert Barnhard, who had newly taken over the supervision of the loan for LaSalle Bank in Boston, that at that time and in a series of future meetings that they had to liquidate or go bankrupt by April of 2006. Six months prior to that, Kay's Merchandise had talked with Gordon Brothers and they had proceeded to analyze their inventory and some of their real estate to establish values of it. And in a general flurry of activity that followed the meetings with LaSalle Bank, they reached out to Gordon Brothers again. They also reached out to people who could secure replacement financing and they reached out to potential liquidators and to potential bankruptcy counsel. And they engaged all those people to work on parallel tracks to figure out what to do about this ultimatum that had been issued by LaSalle Bank. Gordon Brothers knew that Kay's did not want to liquidate or go bankrupt. They knew that because they had rejected the offer. So Gordon made representations to Kay's. They said that they had experienced personnel to conduct a turnaround. They said that they would engage in a plan of turning around the operations and would run it as a going concern at least through the Christmas holidays. They also said that they would use their financial muscle to supply guarantees to vendors who had delayed shipment in light of the controversy after LaSalle Bank started stopping payment on their checks to get inventory flowing again and that they would issue those guarantees within seven days. Now their plan was to go to the creditors who were owed millions of dollars as a group and say, look, would you take a discount of 30% or 50% off your outstanding bills in exchange for money that we would provide immediately? And the plan was if they could compose those creditors, then they would proceed with a plan for a turnaround. Kay's agreed to that first in a letter of intent and then with an LLC agreement gave up 77.5% of the new LLC. Gordon was made manager. They paid him $1 million and Gordon Brothers stood up to the plate and spent $40 million to take out the LaSalle loan. There was quite a bit of fanfare in the press and among the employees saying that now Kay's was going to be saved. Now Kay's was going to preserve its legacy and all that it meant to the local communities that it served. You actually, as I understand it, actually retained two law firms, including one of the largest law firms in the country, to negotiate a written, formal written agreement. That's correct. Mayor Brown and Platt was engaged Ron Gibbon and John Cobb was a local lawyer, longtime case lawyer, indicator. I think most of what you just told us about the agreement was not, I've read that contract, it's not in there, is it? No. The fraudulent representations or what we've alleged to be fraudulent representations were not included in the LLC agreement. The LLC agreement... That's right. And if I understand it, you want to proceed independently on the fraud saying that it's not eliminated by the fact that there was a subsequent written contract. You want to proceed on an expectancy damages theory and the district court found though that you had no, your proof of expectancy damages was too speculative. Yes, that was one ruling of the court. The court ruled that James Seward's testimony was speculative. So don't you need to convince us today that that ruling was erroneous, that your proof of expectancy damages was speculative, that that was a wrong ruling? I do hope to convince you today, if I haven't already in the booths, that the ruling on the expectancy damages was erroneous. But I would also point out that in the record, we allege that had Gordon Brothers told us the truth, we had reliance damages of $11 million. In other words, if Gordon Brothers had said, you have to liquidate, we had an expert, Mr. Friedman, who's provided a report which is in the record, which says that we would have earned $11 million, Kays would have earned $11 million in the event that liquidation was decided upon and they had decided to liquidate. That option was foreclosed by Gordon's representations that induced us to enter into the LLC agreement with them. Two more. On the expectancy damages, I've looked at the expert report. Is that the report of Mr. Seward? Yes, it is. And it said, it seems to me the key conclusion he says, it's been suggested that a successful turnaround plan could have been formulated using the services of a turnaround firm that specializes in retailing. How does that get by a speculative, how does that prove damages? As I recall both the Seward report and the district court's ruling on the Seward report, what the district court ruled was that he would take place within a short period of time, or that there was no time frame for the turnaround stated, that was the district court's opinion. But in reality, in his deposition he said it was going to be in a very short period of time. And it doesn't take much time to say stop buying so many toasters and irons and spend more money and time spending furniture. I'm still at the more basic point of fear, expectancy damages to payers as opposed to clients. Depends on Mr. Seward's report. How does an opinion suggesting that a turnaround plan could have been formulated using the services of a turnaround firm specializing in retailing with a specific expertise in overhead cost management, how does that even get you to first base? There's two ways to do that. One is to say that, to have Kay Eldridge or some other Kay's witness say, we would have engaged a turnaround firm. And that just closes that link. In other words, it's a hypothetical question if you haven't If you could have done that, then they could have done it. So don't you usually need to show that it's more probable than not that using an available resource that you've evidenced was available that had that expertise, that you not only could have done it, but that you would have done it? You always have to do that, Your Honor. I don't want to run away from that. You always have to prove more probable than not to a reasonable degree of certainty that you would have done it. But the second avenue that we have available to us is that we were already beginning that turnaround process. That's why LaSalle Bank in Chicago had not called the loan and was not upset about the loan at all. Because they said we are reducing our inventory on items like electronics that didn't have as much of a profit margin as the other products did. And we were expanding our interest in furniture and diamonds, which the profit margin was substantial in those. With respect then to the expectancy damages, Mr. Seward also said that the attack on Seward's opinion was that with respect to the turnaround plan. But in reality, there was no showing that there were any costs to be incurred. And there aren't any costs to be incurred by reshuffling your inventory. It's the same general overhead that you had before. He also said, and this opinion was not discussed or criticized by the district court, that the company was worth $38 million at that time. And so that opinion was not negated by the district court. And if we could show through our factual witnesses that they destroyed the company instead of fulfilling the representations that they made, then we would have damages for destruction of the company in that amount in any event. And it does show that the $38 million that he had as 22.5% of the LLC is about the same value as what the company was worth before Gordon Brothers took us over. There was some suggestion by the district court that we didn't identify the name of the turnaround firm. But I suggest that in many cases, no identification of the person doing something is required. If you need a name replacement in 10 years, you don't have to identify the name of the doctor that's going to do the name replacement. But you need a replacement firm that's going to put up $40 million to take out the bank. How do we assume that was just sort of on the back shelf? Yes. Here's the issue. With respect to expectation damages in a fraud case under Illinois law, you take it as benefit of the bargain damages. And so the fact is that if Gordon Brothers performed in accordance with its representation, it took out the South Bank. That's why I have such difficulty examining the district court's opinion when it discusses the fact that liquidation was a foreseeable prospect or that it was likely or whatever. When Gordon Brothers took out LaSalle's loan, the financial circumstances, dire or otherwise, were over. And that was part of the benefit of the bargain. So we don't have to reach the issue of whether $40 million was going to be obtained if we hold Gordon Brothers to the representations that it made. Now it is true that had Gordon Brothers told us the truth, that liquidation, you're going to liquidate, you have to liquidate, we're not going to try to turn around the company. We're not going to represent anything about that. We're going to liquidate. Then we had our choice to hire a liquidator. And that's why I mentioned the $11 million option that we had because we had a liquidator and we had an expert who testified to a reasonable degree of certainty that we would have made $11 million, not the $1.7 million that they paid us, had we gone the liquidation route, had they, in fact, told us the truth. So if you, I see your point. If you're going to go on the expectancy, then you say we could pocket the $40 million, but then you need the turnaround to be successful. Yes. All right. Do you have, I didn't see any evidence in the record at all that Gordon possessed the unique expertise of a turnaround specialist as well as expertise in inventory control that your expectancy damages was entirely predicated upon. In other words, your expert never said that even if Gordon had tried, that if Gordon had tried to do what you say they promised to do, that there would have been any different results. Understood. But what I'm saying is that they represented that they had the expertise to inducement. They said they had the expertise to turn us around, and they failed to do that. They didn't have the expertise, and that's part of the reason why they never intended to try to turn us around. So now what you're saying essentially is you've got a guarantee. I can't say that, Judge. There is no guarantee of financial performance, but you can project what the likely outcome is to a reasonable degree of certainty or more probably than not. And the fact is that if you say you have the expertise, you have the financial muscle, you've taken out the circumstances that caused the dire circumstances that we were in, and you have a plan for a turnaround, and you don't, then you've lost the opportunity to pursue those profits, and you suffer the damages that an expert can project to a reasonable degree of certainty. Thank you. Ms. Fowley, good morning. Ms. Fowley, good morning. May it please the Court, Theresa Foody of Curtis-Millay Provo-Colton-Moseley on behalf of the Defendant Appellees. Picking up on the issue of the benefit of the bargain damages and the decision to preclude the expert witnesses that supported those damages, that's a decision that's reviewed by abuse of discretion standard. And if you're following the logic of the benefit of the had the alleged misrepresentations been true. So let's think about that. The alleged misrepresentations are that Gordon would have waited until after Christmas if the creditors were composed, which if they weren't composed, they would have liquidated immediately. If they were composed, Gordon would wait until after Christmas to make a decision whether to liquidate or to run as a going concern. That Gordon Brothers would have made best efforts to consult the case, and that Gordon Brothers would have guaranteed the vendors and got the inventory flowing again in a week. There's just no way that any jury could have determined with reasonable certainty how the financial results of this company, which were in dire straits, and everyone admits the financial condition of this company was in dire straits, would have been different if instead of running it for six months and deciding to liquidate in October at Christmas time, they had run it all the way through Christmas and then decided on December 26, okay, today we're deciding to liquidate. There's no way anyone could tell how the financial results would have been different had those representations turned out to be true. And Judge Woodlock acted well within his discretion in looking at Professor Seward's report and finding, one, Professor Seward doesn't even really try to say that. He doesn't really try to say if these representations had been true, which would have been the benefit of the bargain formulation, how would the financial results have been different? Instead, Professor Seward says, well, if there was some hypothetical turnaround firm in the world that was interested in this, they would have focused on the SG&A expenses, and they would have focused on inventory, and they would have miraculously been able to make those things much better while changing none of the other financial results, and the company would have been worth, and this was the bottom line conclusion, bear in mind, the company would have been worth $171 to $263 hundred million more if only they had waited until Christmas to make the decision to liquidate, if you followed the benefit of the bargain. It was complete conjecture piling one assumption on top of another unreasonable assumption, and Judge Woodlock was well within his discretion in saying, I can never hand this over to a jury. There's no reasonable basis here for a jury to make a finding. Now, in that regard, it's important to bear in mind that there was a number of facts here that were undisputed on the record below. It was undisputed that in the summer of 2005, some nine months before the events at issue, Old Case was already thinking about liquidation. They asked an investment banker, William Blair, they engaged them to talk to them about perhaps selling the business. They had been experiencing losses. The business wasn't going well. It was one of these liquidation warehouses that don't even exist in retail anymore in this country. I think Old Case was the last of those strategic buyers going to purchase this business. You know, the best thing for you to do is to liquidate. So they engaged Gordon Brothers at that time to give them advice on doing liquidations and doing store closing sales. So even then in the summer of 2005, they're already contemplating that this is where they have to go. They have to go to liquidation. Then nine months later, when the events at issue take place, the circumstances had gotten disastrous for them. They had a disastrous Christmas selling season in the past December and their bank had discovered that they had diverted $3 million in loan funds to another family owned business in addition to the financial covenant violations. So the bank is looking at them and they're saying, wow, you've been in violation of financial covenants for a while. You're losing business and your trend is to lose more and more business every year and now we find out that you've taken loan funds and you've sent it to another family owned business. No more. No more. So the bank said, look, you're going to have to, so the bank engaged a consultant to come in there because they said, well, we need a 13-week cash flow. Okay, said we can't provide you with a 13-week cash flow. So the bank hired their own consultants at Alliance Management and it's in the record, their report. Their report says, look, this business model is broken. This business cannot survive and on the basis of that, the bank said, look, you have to file for liquidation and they hired a very sophisticated counsel, Mayor Brown, and they had their long-time trusted corporate counsel, John Cobb, and they were planning on a Chapter 11 liquidation. And it was at that point that they had these conversations with Gordon Brothers. And Gordon Brothers comes in and says, you know, pays off the bank, right? Gets that pressure off of them, composes the creditors at 50% of their claims, and then comes in and for the next five or six months they tried to operate that business. And they made good faith efforts to change some of the inventory and to change the way they were operating. And there was even testimony about, you know, they had furniture warehouses and they had been using one central warehouse and Gordon came in and said, well, you should have satellite warehouses. And there was evidence in the record that Gordon Brothers came in and they tried, but the business was just broken. And at the time that they were having these allegedly fraudulent misrepresentations, there's plenty of written evidence in the record that they were talking about this as a broken business. There's an email that Judge Woodlock relies upon from Mr. Weinstein at Gordon Brothers to old Kay's attorneys where he says, look, I understand you're telling the creditors that we're going to try to run this as a going concern for a period of time, but we can't make any promises here. This is a broken business that we see some underlying value here, but we don't want to overpromise. And there was an LLC agreement that was 28 pages, heavily negotiated by sophisticated counsel. And they actually had a best efforts clause in there, best efforts that they would consult with old Kay's. If there was to be a best efforts to turn it around, why wasn't that written into the agreement? Best efforts to consult was written into the agreement. Why wasn't best efforts to turn around written into the agreement? There just isn't any representation of fact here that anyone can grab onto. Is there somebody, is someone here going to discuss the rule of law issue? Sure. The award of the sanctions or the issue as to who the sanctions were awarded against? The award of the sanctions was based on the fact that at the time that defendants moved for their second summary judgment motion on the remainder of the complaint, plaintiffs belatedly a couple of weeks after the defendants were given permission to move for summary judgment. Plaintiffs said, well, we would like to make a cross motion too, and they described their grounds. And their grounds were clearly, even if they weren't barred as a matter of law, their grounds were clearly very factual. Their grounds were, we want summary judgment that they mismanaged the furniture department in the way that they just made the decision about the satellite warehouses and then the decision about the furniture they brought in. We want to grant summary judgment as a matter of law that they mismanaged the furniture department. And there was obviously factual disputes on both issues as to that. They had an expert who criticized the way we managed the furniture department. We had an expert who said we managed the furniture department well. We had factual witnesses who said that. They had factual witnesses who said that we didn't. But it's clearly a factual issue. And at the time they moved for permission for the cross motion, we opposed giving them permission, arguing to Judge Woodlock, well, Judge Woodlock, this is going to be, we're going to all wade into these factual issues about management of the furniture department and spend our time doing that, when obviously you can't get summary judgment when there's material issues of disputed fact. You know, putting aside that they haven't, even putting aside from the legal issue, that they hadn't stated an implied covenant claim as a matter of Delaware law. And Judge Woodlock said to them, he said, look, I'm not going to stop you from filing a motion, but I'm warning you. If you file a motion that has no possibility of success, you need to consider the application of Rule 11. And despite that warning, they went ahead and they filed the motion anyway. And it was filled of factual disputes and factual issues. So Judge Woodlock acted well within his discretion in finding that because they filed this motion that had no conceivable chance of success under well-known law about the standards for summary judgment, that that warranted a Rule 11 sanctions finding. Now, Your Honor, we agree with the appellants that on the record below, we made the motion for the Rule 11 sanctions against counsel. And Judge Woodlock discussed the conduct of counsel and that there seems to have been, you know, like a mistake, an error, like a misstatement or an oversight in awarding the judgment against the plaintiff's parties as opposed to awarding against the plaintiff's counsel. And we believe that the appropriate remedy for that would be to remand with a direction for Judge Woodlock, you know, to correct the award so that it stands against counsel as opposed to standing against the party. But the Rule 11 sanctions were certainly warranted and a good exercise of Judge Woodlock's discretion here. Does the motion become frivolous because you submitted something in opposition? You're saying it was frivolous ab initio? It was frivolous because it was quite clear that what they were raising was factual disputes, even if they weren't barred as a matter of law, which we felt that they were, in order for them to have been granted summary judgment, as opposed to just resisting our summary judgment, in order for them to be granted summary judgment, they would have had to have shown that they were entitled to judgment as a matter of law on highly specific factual issues. They would have had to have Judge Woodlock find that as a matter of law, we had mismanaged the furniture department in the manner in which we bought furniture and in making a decision about satellite warehouses instead of one main warehouse. And any rational attorney looking at that would say, these are factual disputes that aren't appropriate for summary judgment. And I think it's compounded by the fact that this was brought up and raised and talked about before they went ahead and made the decision to file the motion. And the judge warned them before they made the decision to file the motion, like, are you sure that you want to file that motion? There seems to be fact issues there that would make it inappropriate for summary judgment. And then they went ahead and did it anyway. Unless there are further questions? Thank you, Your Honors. Thank you. Mr. Patterson? Thank you, Your Honor. Briefly, with respect to the dire straits the case was supposedly in, not everyone agrees with that. LaSalle Chicago did not agree with that and they planned to renew the loan with a slight increase in interest rate and they reported upon inquiry that CASE was taking the steps to improve profitability by exiting unprofitable lines and concentrating more on furniture and diamonds. Rick Power didn't agree with it and Mr. Seward didn't agree with it. With respect to the assumptions, Mr. Seward did discuss reduction of SGA expenses, but he said they could be reduced to historical levels and it's not an unwarranted assumption to use history as your guide with respect to projecting what was going to do. With respect to the furniture and diamonds, the profit margins had increased and the gross amount of sales in both categories had increased and that was the way for the company to defeat the so-called category killers of the big box retailers in addition to the fact that we were in smaller markets than they were. How are you ever going to get summary judgment on the breach of implied covenant claim? I'm sorry? How are you ever going to get summary judgment under Rule 68 on the breach of implied covenant claim? What I was thinking at the time was when we started to research the opposition to their motion for summary judgment on the breach of contract and the alternative argument on the breach of covenant of good faith with respect to the management and operations of the company, we thought we were arguing that they had never provided the documents to allow us to do a reconciliation. They had never provided the documents, notwithstanding the fact that the LLC agreement gave them that obligation. It only gave them that obligation. But that's not a breach of implied covenant. You'd be alleging there a breach of an express term of the agreement, which you didn't bring and assumably there was a reason why you didn't bring it. I'm sorry? Sure. I thought we were talking about a breach of the implied covenant of good faith, not a breach of an express term of the contract. Yes. What we had done was we had submitted the affidavit of an expert or a report of an expert that said that there was 1.1 million of damages, and we had submitted the affidavit of Jeff Clouser, who had experience in the furniture industry, and took undisputed facts that Gordon had not surveyed the market, had not studied what merchandise was. Sure, and suppose the jury disagreed with both of those experts? What we thought at the time was that there was no contrary evidence to contradict that. On whether they were behaving reasonably as they were managing the... As whether they had... They were saying they were reasonable, weren't they? They said that they made efforts to try to increase sales. But what the undisputed facts were is that they didn't survey the market and they brought liquidation inventory in, starting in June. Liquidation inventory is used inventory, inventory that hasn't sold before anywhere. And that's what was undisputed, that they, starting in June of 2006, they brought in liquidation wholesaler inventory, which is never going to sell. And they hadn't preceded that with any study of the market. And we actually had a functioning and profitable furniture department. And those facts on the furniture were undisputed, and they were undisputed notwithstanding the fact that the district court said that Mr. Clouser didn't make that argument. He did say that was arbitrary and unreasonable to a reasonable degree of certainty. Thank you. Thank you, Judge.